**NATIONAL BANK OF WATERLOO, Appellee,**

v.

**John MOELLER, and Dorothy Moeller, Defendants,**

**Mason City Production Credit Association, Appellant.**

No. 87–1716.

Supreme Court of Iowa.

Jan. 25, 1989.

Rehearing Denied Feb. 20, 1989.

Charles W. McManigal and Darrell J. Isaacson of Laird, Burington, Heiny, McManigal, Walters and Winga, Mason City, for appellant.

Michael M. Pedersen of Martin, Nutting, Miller, Keith & Pedersen, Waterloo, for appellee.

Considered by HARRIS, P.J., and SCHULTZ, CARTER, NEUMAN, and ANDREASEN, JJ.

NEUMAN, Justice.

This litigation began as an action in equity to foreclose deeds of trust on two parcels of farm real estate located in Howard County, Iowa. Judgment was entered against the principal defendants, John and Dorothy Moeller, and their real estate was subsequently sold at sheriff's sale. Deeds have remained in escrow pending resolution of the current controversy over the relative priority of two lienholders, appellee National Bank of Waterloo (bank) and appellant Mason City Production Credit Association (PCA).

The district court resolved the priority dispute in the bank's favor, holding alternatively that (1) PCA agreed in writing to subordinate its mortgages and the bank relied on that agreement to its detriment; and (2) later advances made by PCA with actual knowledge of the bank's intervening lien were junior to the bank's deed of trust.

On appeal, the PCA contends there was insufficient factual support for the court's first finding and no legal basis for the

second. We agree and reverse the district court.

## I. *Factual Background.*

Two parcels of agricultural real estate are involved here. The Moellers owned a 328-acre farm known as "Davis Corners." Across the road was the Pierce farm. In January 1983, John Moeller was approached by Pierce's agent, Luke Kollasch, about buying the Pierce farm. Moeller was interested but at the time he was "asset rich and cash poor."

Pierce's financial position at the time was nothing less than precarious. He was buying his farm on contract, and he faced a balloon payment in excess of $500,000 due March 1, 1983. The National Bank of Waterloo held an assignment of Pierce's interest in the real estate contract as security for $70,000 in outstanding loans. Thus the bank was as eager as Pierce to unload the property before Pierce's interest in it was forfeited.

The bank agreed to lend Moeller the full purchase price of the Pierce farm (approximately $565,000) on the representation by sales agent Kollasch that Moeller's regular financier, the PCA, would subordinate its four mortgages on Moeller's Davis Corners property so that it could be given as additional collateral. The bank neither discussed this proposed subordination with Moeller nor made it part of the loan commitment. Nevertheless, Moeller became aware of the proposal through Kollasch, and discussed the idea with PCA.

PCA was amenable to the subordination as long as Moeller could furnish substitute collateral. That did not appear to be a problem in view of Moeller's extensive land holdings. A nearby Minnesota farm seemed a likely substitute.

In early March 1983, bank officer Willis Crees and PCA branch manager James Morrow discussed the proposed subordination by telephone. Confirming that conversation, Morrow wrote a letter to Crees on March 21 which stated, in pertinent part:

PCA is agreeable to the substitution and we are currently in the process of accomplishing this. As discussed, about 30 days will be required due to Minnesota procedural problems and the nature of the collateral being secured. Provided no unexpected problems arise, PCA will subordinate our position to the bank's mortgage sometime before the end of April.

No further communication between the bank and PCA occurred. The bank closed the Pierce/Moeller deal on March 30. Funds were disbursed to pay off the Pierce contract and Moeller executed deeds of trust in favor of the bank on both the Pierce and Davis Corners properties. Contrary to its usual policy, however, the bank made no post-closing title search to assure itself of the priority of its liens.

Eighteen months later, when Moeller had difficulty servicing this new debt, the bank learned that the proposed subordination had never materialized. It turns out that Moeller had been unwilling to advance substantial attorney fees and title expense required to accomplish the substitution of collateral. In the interim, PCA had lent Moeller an additional $275,000 in operating loans pursuant to future advances clauses in PCA's prior mortgages on the Davis Corners property. Thus when the bank foreclosed its deeds of trust on both the Pierce farm and Davis Corners in April 1985, a controversy arose over who was entitled to priority on Davis Corners, the bank or PCA. From a judgment entered in favor of the bank, PCA now appeals.

## II. *Arguments on Appeal.*

■ Preliminarily we note that this case was tried in equity and thus our appellate review is de novo. Iowa R.App.P. 4. We may give weight to the trial court's findings but are not bound by them. *Israel v. Farmer's Mut. Ins. Ass'n*, 339 N.W.2d 143, 146 (Iowa 1983).

The district court resolved this priority dispute on alternative grounds: first, on a theory of promissory estoppel; second, on a common-law theory that future advances made by a senior mortgagee with knowledge of an intervening lien of a junior mortgagee are inferior thereto if not oblig-

atory. We shall consider the PCA's appellate challenge to these alternative holdings in turn.

A. Promissory estoppel.

The district court found that PCA's March 21 letter to the bank evidenced a promise by PCA to subordinate its mortgages on Davis Corners in order to give the bank a superior lien on the property.[1] The court further found that in reliance on that promise the bank advanced loan proceeds to Moeller to its detriment and PCA is now estopped from asserting the priority of its lien.

On appeal, PCA argues the bank presented insufficient proof of any agreement to support a recovery based on promissory estoppel. From our de novo review of the record, we quite agree.

The essential elements of promissory estoppel are well established: (1) a clear and definite agreement; (2) proof that the party urging the doctrine acted to its detriment in reasonable reliance on the agreement; and (3) a finding that the equities support enforcement of the agreement. *In re Estate of Graham*, 295 N.W.2d 414, 418 (Iowa 1980); *Johnson v. Pattison*, 185 N.W.2d 790, 795 (Iowa 1971); *Miller v. Lawlor*, 245 Iowa 1144, 1154, 66 N.W.2d 267, 273 (1954). The burden of proving estoppel is on the party asserting it and strict proof of all elements is required. *Pillsbury Co. v. Ward*, 250 N.W.2d 35, 39 (Iowa 1977).

Turning to the first element—a clear and definite agreement—we note that no Iowa case has squarely defined this fundamental feature of the doctrine. A comparison of pertinent cases may illuminate the concept, however. In the case of *In re Estate of Graham*, we found that deposition testimony relating a conversation in which a decedent said he wanted to "keep the farm in the family" was insufficient to prove an agreement to devise the property to his brother, the other party to the conversation. *See* 295 N.W.2d at 419. By contrast, in *Miller v. Lawlor* we upheld an oral promise by a landowner not to construct a home on his property that would block his neighbor's view. *See* 245 Iowa at 1151–57, 66 N.W.2d at 272–75. We upheld a similar promise not to use land for commercial purposes in *Johnson v. Pattison*, 185 N.W.2d at 795.

By way of distinguishing these cases, we observe that *Miller* and *Pattison*, unlike *Graham*, demonstrated a clear understanding by the promisor that the promisee was seeking an assurance upon which he could rely and without which he would not act. *See Miller*, 245 Iowa at 1155, 66 N.W.2d at 274. This dual emphasis on clarity and inducement parallels the Restatement (Second) definition of an agreement for purposes of promissory estoppel as "[a] promise which the promisor should reasonably expect to induce action . . . on the part of the promisee." Restatement (Second) of Contracts § 90 (1981).

With this background in mind, we look at the record before us. Preliminarily we note that the parties seem equivocal about whether they think the language of the March 21 letter is clear or ambiguous. If the former, then of course the intent of the parties must control and that is determined by what the writing itself says. Iowa R.App.P. 14(f)(14). If the latter, then other evidence can be considered in ascertaining the true intent of the parties. *Ted Spangenberg Co. v. Peoples Natural Gas*, 305 F.Supp. 1129, 1133 (S.D.Iowa 1969).

The bank persuaded the trial court that the March 21 letter—when read in the light of the earlier conversation between bank and PCA officers—can only be interpreted as an unconditional promise by PCA to subordinate its mortgages by the end of April. The bank does not seriously dispute that the earlier conversation closed with PCA amenable, but uncommitted, to subordination. But because the Pierce forfeiture deadline was rapidly approaching, the bank insists that it impressed upon PCA its need for a commitment to subordinate at the earliest possible date. Receipt of the

---

1. PCA's mortgages were in fact secondary to a small first mortgage held by Metropolitan Life Insurance Company. That loan was later paid and is not at issue here.

March 21 letter allegedly signaled the unqualified agreement to subordinate that it was looking for.

The PCA, on the other hand, contends that the very language of the letter bespeaks a conditional response to the bank's proposal. It asserts that the "agreeable to substitution" language merely confirmed the tenor of the previous conversation. In other words, the letter restated PCA's status: amenable, but not yet committed, to subordination. It argues that the phrase "[p]rovided no unexpected problems arise" clearly conveyed a tentative agreement subject to future conditions.

We need not resort to maxims of contract interpretation to sort out these conflicting arguments. Whether we focus solely on the words of the March 21 letter or consider its meaning in the alleged illumination of surrounding circumstances, we are simply unable to draw from it either a promise or "clear and definite agreement" that the PCA would reasonably understand to induce action.

First of all, we think the crucial language of the letter is decidedly conditional, not definite. Secondly, not even the bank suggests that PCA intended to subordinate its mortgages unless and until it had substitute collateral in hand. After all, this transaction was designed to accommodate the bank, not PCA. Given these undisputed facts, we think it unreasonable to find the bank was *induced* by the words of the March 21 letter to hastily disburse half a million dollars without so much as a follow-up phone call or cursory title examination of the property securing the loan. Nor can we find in the record any evidence that PCA reasonably expected it to do so.

In conclusion, the bank may have sought a written commitment to subordinate, but it did not get one. Without such a promise, the bank's reliance on the doctrine of promissory estoppel should not have been sustained by the district court.

### B. "Common-law" rules of priority.

■ It is undisputed that when Moeller gave the bank a deed of trust on his Davis Corners property, the PCA held four prior mortgages on the same ground securing an outstanding indebtedness of approximately $275,000. These mortgages reflected various recording dates as far back as 1973. They secured an operational loan renewed in January 1982 for $270,000, and several term notes for capital expenditures.

It is also undisputed that although the bank and PCA had no further communication relative to Moeller after the March 21 letter, by late Spring 1983 PCA learned of the bank's lien on the Davis Corners property through conversations with Moeller. Nevertheless, PCA continued to lend Moeller substantial sums for his farm operations pursuant to future advances clauses contained in its mortgages. The record reveals that the principal obligation on Moeller's operating loan was paid down to five dollars by December 1983, exclusive of accrued interest, while the balance on the term notes stood at $70,000. Further advances by PCA, however, thereafter increased Moeller's indebtedness to over $300,000 by the time the bank's foreclosure proceedings were initiated in April 1985.

Given this factual record, the district court sustained the bank's claim of priority by applying the following legal conclusion:

> Advances to a borrower by a lender holding a senior mortgage after that lender has actual knowledge of the existence of a junior mortgage, are junior to the intervening rights of the junior mortgagee unless the senior mortgagee's mortgage makes such advances obligatory.

Although Iowa has never adopted this common-law rule, the bank correctly asserts that we have recognized it by way of dicta in two prior cases, *Freese Leasing, Inc. v. Union Trust & Savings Bank*, 253 N.W.2d 921, 925 (Iowa 1977) and *Corn Belt Trust & Savings Bank v. May*, 197 Iowa 54, 59–67, 196 N.W. 735, 738–40 (1924). Since trial of the case before us, however, the Iowa legislature has specifically modified the rule by statute. *See* Iowa Code § 654.12A (1987). Thus the question is whether the equities favor application or rejection of the common-law rule in a trans-

action, like the present one, predating the enactment of section 654.12A.

The new law, passed in 1984, clearly favors senior mortgagees. It provides, in pertinent part, that mortgage instruments containing prescribed language giving notice of a future advances provision,

> are senior to indebtedness to other creditors under subsequently recorded mortgages ... or filed liens even though the holder of the prior recorded mortgage has actual notice of indebtedness under a subsequently recorded mortgage or other subsequently recorded or filed lien.

Iowa Code § 654.12A. Although the bank claims this statute demonstrates a legislative intent to depart from what the bank contends had been the prevailing rule in Iowa, we are not convinced that the statute conflicts with priority rules previously espoused by this court in the *Freese Leasing* and *Corn Belt* cases.

In *Freese Leasing*, our attention was focused on a priority question that turned on whether a lender and borrower intended the "dragnet clause" of two real estate mortgages to cover subsequent loans for the borrower's used car business. *Freese Leasing*, 253 N.W.2d at 925. We mentioned in passing the "prevailing rule" that as between competing lienholders, "[m]ere constructive notice" of a later encumbrance would not defeat the priority of future advances made by a first mortgagee, even after recording of the subsequent mortgage, inasmuch as the prior mortgage is "affected only by actual notice." *Id.* We did not pursue the precise "effect" of any actual notice, however, as it was inconsequential to the primary holding of the case: that dragnet clauses will only secure future advances that are of the same kind and quality or relate to the same transaction as the principal obligation. *See id.* at 927.

In a later case extending the *Freese Leasing* "relatedness" rule to future advances made under article nine of the U.C.C., we recognized that future advances clauses serve as a useful tool in business transactions. *In re Estate of Simpson*, 403 N.W.2d 791, 792 (Iowa 1987). We also observed that rather than placing harsh restrictions on their use, our concern should focus on what the parties intended to secure when executing the original security agreement. *See id.*

Likewise, in the earlier case of *Corn Belt Trust & Savings Bank v. May*, we upheld the priority of future advances made by a senior mortgagee in the face of a claim by a junior encumbrancer that once its intervening mortgage was recorded, all advances made pursuant to the prior mortgage became secondary. We rejected the suggestion that the constructive notice given by recording the intervening mortgage was sufficient to "postpone" the lien of the prior mortgage "for advances made thereafter." *Id.* at 59, 196 N.W. at 737. Nevertheless, because the junior mortgagee had actual notice of the prior mortgage and the extent of its future advances clause, but the prior mortgagee had only constructive notice of the intervening mortgage and "no [actual] notice or warning ... not to advance further sums," we held the senior lienholder should be equitably "protected for the money advanced." *Id.* at 59–60, 65, 196 N.W. at 738, 740.

We think the equities of the present case compel a similar result. The bank was very much aware of PCA's prior mortgages on Davis Corners when it lent a substantial sum to Moeller in exchange for a deed of trust known to be junior to PCA's lien. Yet for eighteen months the bank took no action with respect to PCA's lien, either to follow up its request for subordination, check the status of PCA's loans to Moeller, update the abstract of title to the Davis Corners property, or (as suggested in the *Corn Belt* case) warn PCA that it deemed the bank's deed of trust superior to any future advances made by PCA under its prior mortgages. Any of these rudimentary procedures would have revealed the potential impairment of security the bank now belatedly claims. Instead, the bank argues that all blame for its predicament should fall on PCA.

To the contrary, we think that PCA had the right to rely on the priority of its mortgages, not only with respect to the

original obligations secured thereby, but for future extensions of credit authorized by the language of the recorded instruments. Those advances may not have been obligatory, but they clearly related to the original transactions and were thus valid and enforceable under the standard adopted in *Freese Leasing*, 253 N.W.2d at 927; *see also Decorah State Bank v. Zidlicky*, 426 N.W.2d 388, 390 (Iowa 1988). Moreover, the mortgage documents gave PCA the absolute right to advance sums for the payment of delinquent taxes and insurance in order to protect the encumbered property. These contract terms, designed to benefit both the lender and the borrower, would be effectively defeated by the adoption of the "common-law" rule proposed by the bank. We find no merit, legal or equitable, in allowing such a result.

Accordingly, we reverse the judgment of the district court and remand the case for entry of judgment establishing the priority of PCA's liens on the Davis Corners property.

REVERSED AND REMANDED.