**Leora DIDIER, Appellant,**

v.

**J.C. PENNEY COMPANY, INC., a New York Corporation, Appellee.**

**No. 88–5120.**

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 13, 1988.

Decided Feb. 16, 1989.

A. My daughter and I were together, and she was—she always walks a few feet ahead of me, and she was walking down the aisle, and I saw her slip and slide and slip and slide, and I saw all that glass and all that shiny stuff on the floor, and I thought, "I wonder if she's going—" I stopped for a minute, and then I thought she was going to fall, but then she caught a hold of the counter and she caught herself, and I thought, "Well, I'll take a step and see what happens to me," and then, bang, I was down on the floor unconscious with a broken back and leg.

\* \* \* \* \* \*

Q. All right. Do you remember seeing the perfume counter?

A. Well, we didn't expect anything like that. I walked down here (Witness indicating), and she was going like this (Witness indicating) and like this (Witness indicating), and finally she grabbed like this (Witness indicating), and I thought, "I wonder what's going on here?" And then I started to walk and I went down.

Q. You were indicating that your daughter—you were waving your hand back and forth, by that—

A. Well, she was going every which way because she was trying to catch herself. There was glass all the way down on the floor.

Q. About how far ahead of you was your daughter?

A. A few feet.

\* \* \* \* \* \*

Q. There was glass on the floor?

A. Glass on the floor the whole way.

Q. By the whole way, what do you mean by that?

A. Well, when I stopped and I looked where my daughter was sliding I could see that shiny stuff on the floor and the glass on the floor, and if you've got it on your shoes you would go quite a ways.

Douglas M. Deibert, Sioux Falls, S.D., for appellant.

William Fuller, Sioux Falls, S.D., for appellee.

Before HEANEY and FAGG, Circuit Judges, and HANSON,\* Senior District Judge.

HANSON, Senior District Judge.

Leora Didier appeals from the final decision of the District Court[1] dismissing her action against J.C. Penney Company, Inc. In the action Didier contends she was injured as a result of appellee's failure to properly maintain its premises. The District Court granted Summary Judgment in favor of appellee finding that Didier had, as a matter of law, assumed the risk which caused her injuries. We reverse.

## FACTS

On December 1, 1984 appellant slipped and fell while shopping in a store owned and operated by appellee. She slipped after stepping on the contents of a broken perfume bottle. Most of the specifics of the fall are best described by Didier's own deposition testimony:

Q. All right. Mrs. Didier, just tell me what happened as you walked through the Penney's store and you fell?

---

\* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. The Honorable John B. Jones, United States District Judge for the Southern District of South Dakota.

Q. And about—you say the whole way, I'm trying to get some idea of how much surface we're talking about.

A. I don't know. A few feet. I don't know.

Q. Did the glass and the—could you see the perfume or liquid on the floor, too?

A. Yes.

Q. Did the liquid cover the entire aisle or part of the aisle?

Q. See, that's linoleum going down there, and that was real slippery with all that goop on it. You could smell the perfume.

Q. Did the perfume cover the entire aisle or just part of the aisle?

A. I don't know. Enough to hurt me.

Diane Miller, Didier's daughter, provided the court with the following deposition testimony regarding the fall:

Q. Then after going through the blouse department, just tell me what happened then?

A. We started down this aisle, the middle aisle, I'm ahead of her, I'm shopping on this side and I'm looking on this side and I'm looking here. All of a sudden I'm falling. I don't know what's happening, but I'm falling. I'm just—and I grabbed a hold of a counter which was in the perfume department, it was like a glass counter, and I got a hold of this thing, and immediately I'm like hollering at her, "Be careful," and I started just right then, and I turned around and she's already going, she's already going.

\* \* \* \* \* \*

Q. If you recall, when was the last time that you looked at your mother before she fell? By that I mean where you were in the store.

A. I don't know. I can't remember.

Q. In any event, when you grabbed the perfume counter it was then that you turned around and yelled at your mother?

A. Not immediately, because I'm grabbing it and yelling, "Be careful." I'm trying to holler, "Be careful," and she's going, she's falling at that time.

Q. Did you actually turn around and look then when you were holding onto the perfume counter?

A. I can't remember. I know I hollered.

Q. About how far behind you was your mother when she fell?

A. A few feet.

Q. About how far were you able to walk from the time you first started to slip until you grabbed that perfume counter to hold yourself up?

A. Please reword that.

Q. About how far—what distance did you travel from the time you first started to slip or lose your balance until you grabbed the perfume counter to hold yourself up?

A. Oh, I'd say about four or five feet I'm struggling.

Q. After your mother fell, is that when you looked down and you saw the perfume and the glass? Let me withdraw that. When did you first see the perfume and the glass on the floor?

A. After I'm holding onto the counter.

Q. In any event, what did you see? When you looked down at the floor what did you see?

A. Lots of glass and lots of liquid, I mean a wet floor.

Q. And about how much of a surface area did this wetness cover?

A. Oh, a six to eight foot square, approximately.

\* \* \* \* \* \*

Q. Just tell me what happened—well, did you actually see your mother fall or did you turn around and she was already on the ground?

A. I did see her fall. I saw her in flight.

Q. And how did she come down, how did she land?

A. She came down on her back.

Q. And just tell me what happened after that?

A. She's laying on the ground, on the floor, on this wet floor, and I'm kneeling

down over her in this glass and this wet floor.

\* \* \* \* \* \*

Q. As I understand it, you were right next to the perfume counter when this happened, so I want you to diagram on the exhibit the location of the perfume counter and where the perfume was situated on the floor. (Witness complies.)

\* \* \* \* \* \*

Q. And the circle next to the rectangle, that's the perfume on the floor: is that right?

A. And glass. Lots of glass.

\* \* \* \* \* \*

Q. Now on the exhibit it's almost a—well, I guess it's an oval shape. I'm trying to describe it.

A. Well, this is the aisle right here. (Witness indicating) It was all over in this whole aisle, that whole area. (Witness indicating)

Q. By—I'm not sure I understand you. What are you telling me? It was in the whole aisle? What do you mean?

A. Well, the aisles—maybe I don't know how wide the aisle is, but this glass and this fragrance, whatever it was, was distributed in this whole floor area.

Q. Are you saying that the perfume extended from one side of the aisle over to the other side of the aisle?

A. Yes.

Q. And in your estimation that's about how many feet?

A. I don't know. Approximately five feet, six feet. I don't know.

Q. And then what was the length of the wet area? You were telling me it went from—

A. About six, seven feet, eight feet.

Both of these depositions were taken on October 2, 1987. Mrs. Didier died on December 7, 1987 so her deposition will necessarily stand as her testimony at trial. There are no other persons known to have witnessed the fall, although three of appellees employees arrived on the scene while Didier was still on the floor. Two of these employees, Evelyn Evans and Jan Van Em-merick, assisted Mrs. Didier, while the third, George Seiler, cleaned up the broken bottle and perfume. Seiler cleaned up the perfume around Didier while she remained on the floor.

Deposition testimony of Evans and Van Emmerick, but not of Seiler, was presented to the court. Neither of these depositions includes any statements regarding whether Didier's location showed that she was in the midst of the hazard when she fell or just on the edge of it. Appellee moved for summary judgment on the basis of the four depositions arguing that they established as a matter of law that appellee was not negligent and that Didier had assumed the risk which caused her injuries.

The District Court denied appellee's motion on the issue of negligence but granted summary judgment on the issue of assumption of risk. It found that Didier's deposition testimony established that she had knowledge of the existence of the danger and an appreciation of its character, and that she voluntarily accepted the risk with sufficient time, knowledge and experience to make an intelligent choice. Appellant challenges this holding arguing that Didier was already in the midst of the hazard when she realized its existence, and that therefore she did not voluntarily accept the risk. Appellee argues that the court was correct on the assumption of risk issue but that it erred in not also granting summary judgment on the issue of negligence.

## DISCUSSION

█ We first note our agreement with the District Court that it would have been error to enter summary judgment on the issue of appellee's negligence based on the evidence before it. The record demonstrates that there is a conflict regarding the amount of time the perfume was on the floor, a factor which could have a significant effect on the issue of whether appellee was negligent. The second issue, whether the District Court erred in granting summary judgment on the basis of assumption of risk, is more problematic.

The most relevant case on this issue is *Myers v. Lennox Co-op. Ass'n*, 307 N.W.2d

863 (S.D.1981). In *Myers* Judge Wollman wrote for a unanimous court that:

A motion for summary judgment can be granted only if there is no genuine issue with regard to any material fact. SDCL 15–6–56(c). Summary judgment is usually not appropriate for negligence actions. \* \* \*

Ordinarily, questions of negligence, contributory negligence, and assumption of risk are for the jury, provided there is evidence to support them. \* \* \* The standards of conduct are for the court to determine, however, when the facts are not in dispute or of such a nature that reasonable men could not differ. \* \* \*

In order to support its assumption of risk defense, appellee must show that appellant not only had knowledge of the existence of the danger involved, whether actual or constructive, and an appreciation of its character, but also that appellant voluntarily accepted such risk by having a sufficient amount of time, knowledge, and experience to make an intelligent choice. \* \* \*

307 N.W.2d at 864.

We agree with the District Court that Didier's deposition indicates that she did have both knowledge of the danger caused by the broken perfume bottle and an appreciation of its general character before she fell. Thus, we turn to the issue of whether the record shows that Didier voluntarily accepted this risk "having a sufficient amount of time, knowledge, and experience to make an intelligent choice" when she took an additional step.

This is a difficult issue because the record does not establish whether Didier, when she decided to take the step that resulted in her fall, was already standing in the middle of the hazard or whether this step brought her into the hazard—an issue which we find to be very relevant. Neither Didier nor any of the other witnesses directly addressed this issue in their depositions and the District Court made no conclusions about it. Appellant has consistently asserted that Didier was in the midst of the hazard when she first noticed it.

The fact that the evidence on this issue is inconclusive requires us to assume, for purposes of review, that Didier was in the midst of the hazard when she made the decision to take the step that resulted in her fall. This assumption is required because a reviewing court must "look at the record on summary judgment in the light most favorable to \* \* \* the party opposing the motion." *Poller v. Columbia Broadcasting Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). That is, we review the facts de novo, and give the party opposing the motion the benefit of all reasonable inferences to be drawn from the facts. *See In re Rolain,* 823 F.2d 198, 199 (8th Cir.1987); *Kegel v. Runnels,* 793 F.2d 924, 926 (8th Cir.1986).

The conclusion that we must assume that Didier was in the midst of the hazard is reinforced by the fact that *Myers* squarely places the burden of proving all the elements of the assumption of risk defense on Appellee, 307 N.W.2d at 864, as *Celotex Corp. v. Catrett* indicates that a party cannot be on the prevailing side of a motion for summary judgment on an issue unless it makes a sufficient showing as to those essential elements with respect to which it has the burden of proof at trial. 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1985). Thus, because Didier's ability to avoid the risk is an essential element of appellee's defense, it had the burden of establishing the facts relevant to this element in its summary judgment motion. Appellee, however, did not establish that there was no genuine issue of fact on this specific point.

This brings the Court to the issue of whether Didier's actions in taking the step can be considered a voluntary acceptance of the risk as a matter of law assuming that she was already in the middle of the hazard when she decided to take the step. Appellee argues that even if Didier were in the midst of the hazard there was such a voluntary acceptance as a matter of law because Didier could have "merely stood there until she obtained assistance from either her daughter or a store clerk." We disagree.

In order to prevail through summary judgment appellee must show that "reasonable men could not differ" over the issue of whether Didier "voluntarily accepted such risk by having a sufficient amount of time, knowledge, and experience to make an intelligent choice" as to whether she should attempt to take one step. *Myers*, 307 N.W.2d at 864. Thus, Didier's actions must be examined to see whether she "had a reasonable opportunity to elect whether or not to subject [her]self to the danger." *Berg v. Sukup Mfg. Co.*, 355 N.W.2d 833, 835 (S.D.1984). For "[i]t is not the knowledge of the defect that precludes a plaintiff from recovering, it is his want of the care a prudent man would exercise in view of the danger." *Stenholtz v. Modica*, 264 N.W.2d 514, 518–519 (S.D.1978).

We find it reasonable to differ over the issue of whether Didier had a reasonable opportunity to elect to subject herself to the danger assuming she was in the midst of the hazard before she realized its existence. Such a person, finding herself facing a sudden peril or emergency not of their own making, has less of an opportunity to make an intelligent choice because of the element of surprise. People do not react as prudently and thoughtfully in an unexpected situation—a fact the law is, and must be, cognizant of. Therefore, we cannot find "as a matter of law" that Didier had a sufficient amount of time and knowledge to make an intelligent choice in this instance. Instead, this type of inquiry is a textbook example "of an issue of fact" inappropriate for determination through summary judgment.

It is true that upon realizing her predicament Didier could have remained where she was and yelled for help. However, we can find no South Dakota case which stands for the proposition that a person who finds themselves in the midst of a danger not of their own making assumes the risk as a matter of law simply by taking a limited step towards determining the extent of the danger. Thus, because a reading of the record in the light most favorable to Didier does not establish anything more than this, we must reverse.

The Court is hesitant to make this holding because of the strong deference we accord to a federal court in interpreting the law of the state in which it sits. However, our review of the record indicates that such deference is not warranted in this case in light of the District Court's failure to even discuss the evidence regarding whether Didier was in the the midst of the hazard or on the edge of it when she took the step which resulted in her fall. This deficiency is important because the question of whether Didier's decision was made in an emergency type situation is vital to the issue of whether she voluntarily assumed the risk. Further, the District Court's failure to discuss the issue leaves us unable to establish whether it based the summary judgment on the determination that Didier was not in the midst of the hazard when she took the step leading to her fall—a determination which we would have to reverse on review because of the requirement that we read the record on this issue in the light most favorable to Didier.

Accordingly, we reverse the District Court's Order granting summary judgment and remand the case for further proceedings.