**BUDGET MARKETING, INC., and Charles A. Eagle, Appellants/Cross–Appellees,**

v.

**CENTRONICS CORPORATION, Appellee/Cross–Appellant.**

Nos. 89–3043, 90–1040.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1990.

Decided March 7, 1991.

Rehearing Denied April 17, 1991.

Mark E. Schantz, Des Moines, Iowa, for appellants/cross-appellees.

Wade R. Hauser, Des Moines, Iowa, for appellee/cross-appellant.

Before JOHN R. GIBSON, Circuit Judge, HEANEY, Senior Circuit Judge, and LARSON,* Senior District Judge.

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

JOHN R. GIBSON, Circuit Judge.

Budget Marketing, Inc. (BMI) and Charles A. Eagle appeal from an order of summary judgment denying their claims against Centronics Corporation for: (1) breach of implied duty to negotiate in good faith; (2) promissory estoppel; and (3) negligent misrepresentation. This suit arises out of the breakdown in negotiations for the purchase of BMI by Centronics. The district court also entered summary judgment against Centronics on its counterclaim of negligent misrepresentation. Both parties appeal. We affirm in part, but reverse on BMI's and Eagle's claim of promissory estoppel and remand for further consideration of this issue.

BMI is a Des Moines-based firm that markets and services magazine subscription agreements. Eagle is the president and principal shareholder of BMI. Centronics is a Delaware corporation based in New Hampshire.

In April 1987, BMI and Centronics executed a letter of intent outlining the basic terms of a proposed acquisition of BMI by Centronics. The letter stated that: (1) initial consideration would be $10 million; (2) additional consideration of up to $7 million would be contingent upon BMI meeting certain cash flow objectives over a 36-month period; (3) Centronics would provide additional capital during the 36-month "earn out" period, but BMI was responsible for cash needs until closing; and (4) BMI was responsible for dealing with any outstanding Federal Trade Commission or Federal Reserve complaints. The letter of intent also stated that completion of the merger depended on four express conditions: (1) satisfactory completion of an accounting, legal, and business review of BMI by Centronics; (2) purchase by BMI of "key man" life insurance coverage for Eagle; (3) avoidance by Centronics of a "significant cash outlay" for taxes because of BMI's planned change in accounting methods; and (4) execution of a definitive and legally binding agreement between BMI and Centronics.

The letter of intent provided that the transaction was subject to approval by the boards of directors of both corporations and by the BMI shareholders. It also contained a specific disclaimer: "[T]his letter shall not be construed as a binding agreement on the part of BMI or Centronics." The letter set a target date for a definitive agreement of May 31, 1987.

Between January and May 1987, Centronics' officials carefully evaluated BMI. On May 21, the parties executed an addendum to the letter of intent that included changes favorable to Centronics.[1] The Centronics' board approved the addendum on May 26, 1987. The addendum changed the target date for the definitive documents to June 30, 1987.

Other steps leading to the proposed merger followed: Centronics' public relations firm issued a press release about the letter of intent, the directors of BMI's parent company and the BMI shareholders approved the proposed merger, and Centronics received all documents necessary to complete the legal, business, and accounting review of BMI.

At the same time, Centronics began considering the acquisition of companies larger than BMI, and, in June 1987, made a formal proposal to acquire the assets of Ecko Group, Inc., for $127 million. In August, Centronics sent its draft of the final agreement to BMI.

Meanwhile, BMI and Eagle began taking the steps necessary to meet the conditions imposed by the letter of intent. Eagle borrowed $750,000 for BMI's use that he personally secured. BMI opened additional branch offices and expanded existing branch operations. BMI also purchased "key man" life insurance coverage for Eagle. Throughout the summer and fall of 1987, Eagle kept Centronics informed of BMI's expansion efforts and the other developments.

---

1. The primary change concerned consideration. Of the $10 million in "initial consideration," Centronics would pay $8 million without condition, but $2 million would be contingent upon BMI meeting certain performance criteria.

During this time, Centronics did not disclose that it might not complete the deal. In August, a Centronics representative confirmed a planned closing date no later than September 30 during a conversation with an official of Norwest Bank, BMI's lender. In mid-September, a Centronics executive participated in a meeting with BMI representatives, an investment banker from R.G. Dickinson, and representatives of Norwest Bank regarding post-closing financing for BMI. All of those present at the meeting proceeded on the assumption that the deal would close, and the Centronics representative said nothing to the contrary. In October, a Centronics representative discussed with a BMI official a necessary SEC filing that would have to be completed after closing. Also in October, Centronics' president and chief executive officer, Robert Stein, told Philip Boesel, an investment banker with R.G. Dickinson who had been involved with the planned merger, that Centronics was ready to move toward closing the deal with BMI.[2]

In November 1987, Centronics abruptly halted preparations for the merger. After evaluating proposed federal tax legislation, Stein sent a letter to Eagle stating that in spite of Centronics' "good faith efforts," conditions beyond its control made the deal "no longer feasible." The letter stated that the merger would lead to a cash outlay for taxes because of BMI's change in accounting methods, thereby triggering one of the negative conditions of the letter of intent.

On appeal, BMI challenges Centronics' stated reason for terminating negotiations as mere "pretext"[3] because the proposed tax legislation did not apply to the proposed merger and the change of accounting methods would not in fact have resulted in Centronics having to make a cash outlay for taxes.

Eagle and BMI brought this action against Centronics, alleging that together they had invested "hundreds of thousands of dollars" to meet the cash flow requirements of the letter of intent. Eagle and BMI originally filed suit in an Iowa district court, but Centronics removed the case to federal court. Centronics filed a counterclaim alleging negligent misrepresentation concerning an FTC investigation of BMI and BMI's financial prospects.

The district court granted Centronics' motion for summary judgment, concluding that: (1) Centronics breached no agreement to acquire BMI; (2) the letter of intent disclaimed a duty to negotiate in good faith; (3) Centronics made no agreement or promise that was sufficiently definite to support recovery under promissory estoppel; and (4) Centronics owed BMI and Eagle no duty to supply the information upon which the negligent misrepresentation claim was based. *Budget Marketing, Inc. v. Centronics*, No. 88–080–A, slip op. at 4–8 (S.D.Iowa Aug. 21, 1989). The court also granted BMI's motion for summary judgment on Centronics' counterclaim. *Id.* at 9–10. Both parties appeal.

The standard governing summary judgment is clear. A motion for summary judgment is not to be granted unless the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court considering the motion "must view the facts in the light most favorable to the nonmoving party and give [that party] the benefit of all reasonable inferences to be drawn from the facts." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). The reviewing court applies the same standard and looks at the facts de novo. *Didier v. J.C. Penney Co.*, 868 F.2d 276, 280 (8th Cir. 1989).

The district court decided this case according to Iowa law, and the parties do not argue that it erred in so doing. We

---

**2.** In a follow-up letter to the telephone conversation, Boesel wrote to Stein on October 23: "I was pleased with our discussion earlier this week regarding your commitment of finally moving ahead toward a closing on Budget Marketing, Inc."

**3.** BMI alleges that the October 1987 stock market "crash" caused Centronics to be interested in other, more lucrative acquisition opportunities.

give great weight to the district court's interpretation of state law, *Nodaway Valley Bank v. Continental Casualty Co.,* 916 F.2d 1362, 1367 (8th Cir.1990), but we are not bound by that interpretation and will reverse if we conclude that the district court incorrectly applied local law. *Kansas State Bank v. Citizens Bank,* 737 F.2d 1490, 1496 (8th Cir.1984).

## I.

■ BMI[4] concedes that the letter of intent did not constitute a binding agreement to merge, but it contends that the letter did establish a duty on the part of both parties to negotiate in good faith. Breach of that duty, it argues, entitles BMI to reliance damages. Specifically, BMI points to language in the letter setting a target date for executing a definitive agreement and stating that the definitive agreement "will contain mutually agreed terms." BMI further points to the extensive efforts devoted by both parties to bring the merger to fruition during the months preceding and following the execution of the letter as confirming the existence of a good faith duty.

Centronics counters by arguing that the specific language in the letter stating that it "shall not be construed as a binding agreement on the part of BMI or Centronics" means that no binding agreement to negotiate in good faith existed between the parties.

The district court found that the language of the letter of intent "plainly disclaimed any such [implied] duty." *Budget Marketing, Inc.,* slip op. at 5. We conclude that the district court did not err.

BMI relies primarily on three cases, *Teachers Insurance & Annuity Association v. Tribune Company,* 670 F.Supp. 491 (S.D.N.Y.1987); *Channel Home Centers v. Grossman,* 795 F.2d 291 (3d Cir.1986); *Itek Corp. v. Chicago Aerial Industries, Inc.,* 248 A.2d 625 (Del.1968), arguing that the overall language of the letter, coupled with the parties' conduct, gave rise to an implied

duty to negotiate in good faith. The facts of these three cases are plainly distinguishable from the facts before us now.

In *Teachers Insurance & Annuity Association,* the parties had signed a financing commitment letter that, far from disclaiming an intent to be bound, stated that the parties had entered a " 'binding agreement.' " 670 F.Supp. at 491. The court concluded that " '[t]he intention to create mutually binding contractual obligations is stated with unmistakable clarity....' " *Id.* at 499.

Such an intent is not present here. The letter of intent between BMI and Centronics clearly stated that it should not be construed as a binding agreement "[e]xcept for the confidentiality obligations set forth in paragraphs 11 and 12." The fact that the parties expressly designated the confidentiality obligations as the sole exception to the general disclaimer lends further support to our conclusion that no binding agreement to negotiate in good faith can be implied from the overall language of the letter. In *Teachers Insurance & Annuity Association,* the court observed that it must determine the intent of the parties "at the time of their entry into the understanding," 670 F.Supp. at 499, and that a party not wanting to be bound by a preliminary letter can "very easily protect itself by not accepting language that indicates a 'firm commitment' or 'binding agreement.' " *Id.* With these observations in mind, we conclude that the parties here evinced no intent to be bound at the time they signed the letter; the letter clearly disclaims that it is a binding agreement.

Similarly, in *Channel Home Centers,* the Third Circuit found that a detailed letter of intent, signed by a property owner and a prospective tenant, gave rise to a duty to negotiate in good faith because the parties intended their promise to be binding. 795 F.2d at 299–300. The court concluded that the agreement contained "an unequivocal promise by [the landlord] to withdraw the

---

**4.** The two appellants, BMI and Eagle, will be referred to simply as BMI in our discussion of the parties' arguments.

store from the rental market and to negotiate the proposed leasing transaction with [the prospective tenant] to completion." *Id.* at 299. No such binding promises are contained in the letter signed by BMI and Centronics. Moreover, *Channel Home Centers* does not suggest that such promises can be implied in the presence of express language disclaiming an intent to be bound.

Finally, *Itek* is equally unpersuasive. The *Itek* court, applying Illinois law, concluded that a jury could find that the parties entered a binding agreement to negotiate in good faith. 248 A.2d at 629. The court relied in part on language in the letter of intent stating that although the parties would have " 'no further obligation' " to each other if they failed to reach ultimate agreement, they would " 'make every reasonable effort' " to agree upon and execute a final contract. *Id.* at 627. The letter signed by BMI and Centronics did not contain similar language. To the contrary, the letter expressly stated that the parties were not bound.

The language of the letter of intent signed by BMI and Centronics is clear, and its interpretation is therefore a matter of law for the court. *Hibbs v. K–Mart Corp.*, 870 F.2d 435, 438 (8th Cir.1989); *Chariton Feed and Grain, Inc. v. Harder*, 369 N.W.2d 777, 785 (Iowa 1985).

Our conclusion that the letter of intent is not binding and did not give rise to an implied agreement to negotiate in good faith is consistent with Iowa authorities. *See Chariton*, 369 N.W.2d at 785 ("[i]n construction of written contracts, the cardinal principle is that the intent of the parties must control; and except in cases of ambiguity, this is determined by what the contract itself says"); *Ridinger v. State*, 341 N.W.2d 734, 737 (Iowa 1983) (en banc) ("[w]here the language is clear and unam-

biguous, the intention expressed in the agreement prevails over the intent or interpretation of a party"); *Hayne v. Cook*, 252 Iowa 1012, 109 N.W.2d 188, 192 (1961) ("[t]he rule is well settled in Iowa that where the terms of a contract are not fully and definitely settled in preliminary negotiations, and a written and formal contract embodying the complete contract is contemplated, no valid and enforceable contract exists until the execution of the written instrument").

██ Courts are reluctant to find implied covenants. *Fashion Fabrics, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 27 (Iowa 1978); *Pathology Consultants v. Gratton*, 343 N.W.2d 428, 434 (Iowa 1984). They "must arise from the language used or be indispensable to effecting the intention of the parties." *Gratton*, 343 N.W.2d at 434. While the court may find an implied term on a point not covered by the express terms of the agreement, "there can be no implied contract on a point fully covered by an express contract and in direct conflict therewith." *Snater v. Walters*, 250 Iowa 1189, 98 N.W.2d 302, 307 (1959). Because the facts here fail to meet the Iowa test for an implied contract and because finding an implied duty would contradict the express disclaimer of the letter of intent, we conclude that the parties did not bind themselves to an obligation to negotiate in good faith, and that the district court did not err in so holding.

## II.

BMI next argues that oral promises made by Centronics after the execution of the letter of intent establish a triable claim based on promissory estoppel. BMI contends that Centronics, on numerous occasions, gave oral assurances that the deal would be consummated.[5] Relying on those

---

5. BMI specifically points to: (1) an October 1987 telephone conversation between Stein and Boesel, the investment banker from R.G. Dickinson, in which Stein stated that Centronics was ready to move ahead toward closing; (2) an oral confirmation in August of a September 30 closing date during a conversation between a Centronics representative and a Norwest Bank

official; (3) a mid-September meeting at Norwest Bank in which all of those present, including the Centronics representative, proceeded on the assumption the deal would close; (4) a statement by Stein in June 1987 that he wanted to defer closing until BMI met July sales projections, which BMI subsequently did; and (5) a statement in October by a Centronics' official to

promises, BMI spent substantial sums of money to comply with the conditions stated in the letter of intent. The record shows that BMI regularly apprised Centronics of its efforts and achievements.

Centronics argues that a promissory estoppel claim is foreclosed by the letter of intent, again relying on the disclaimer language. The district court did not rely on the disclaimer, but rejected BMI's promissory estoppel claim because the statements by Centronics were "vague" rather than "clear and definite." *Budget Marketing, Inc.*, slip op. at 7.

■ Under Iowa law, a party claiming recovery under promissory estoppel must establish: (1) a clear and definite agreement; (2) that it acted to its detriment in reasonable reliance on the agreement; and (3) that the equities support enforcement of the agreement. *National Bank of Waterloo v. Moeller,* 434 N.W.2d 887, 889 (Iowa 1989). *Moeller* further states that while no Iowa case has "squarely defined" the first element of "agreement," that earlier cases of the Iowa Supreme Court demonstrate that agreement can include a "promise" in which the promisor clearly understands that "the promisee was seeking an assurance upon which he could rely and without which he would not act." *Id.* at 889. This approach, *Moeller* states, adheres to the definition of promissory estoppel found in the Restatement (Second) of Contracts, which states:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90(1) (1979). *See also Knudsen v. Andreasen,* 462 N.W.2d 294, 296 (Iowa App.1990) (denying action under promissory estoppel because "[t]here was no *promise* made") (emphasis added).

■ Our study of the record convinces us that BMI's promissory estoppel claim should be submitted to a jury. Reasonable jurors could find that Centronics provided oral assurances to BMI and others that it would close on the deal. In October 1987, for instance, Stein told the investment banker, Boesel, that Centronics was ready to "mov[e] ahead toward a closing" of the deal.[6] Eagle stated in his deposition and in a November 1987 letter to Stein that he and Boesel relied on Stein's "positive assurance" during that conversation to go ahead with the loan that R.G. Dickinson subsequently made to Eagle.[7]

In alleged reliance on Centronics' oral assurances, Eagle and BMI endeavored to meet all of the conditions imposed by the letter of intent. BMI opened new offices, expanded existing operations, hired more dealers and "independents," arranged for necessary credit, and purchased "key man" life insurance coverage for Eagle. BMI contends that it expended considerable effort and incurred substantial expense in doing so. Centronics was promptly apprised of the developments at BMI. We conclude that the evidence of Centronics' oral assurances, coupled with BMI's alleged reliance and Centronics' awareness of BMI's reliance, is substantial enough to establish a triable claim under Iowa's promissory estoppel doctrine. *See Roberts v. Browning,* 610 F.2d 528, 531–32 (8th Cir.1979) (motion for summary judgment should not be granted if it appears the position of the nonmoving party would be supported at trial by "substantial evidence").

a BMI representative that a certain SEC filing would have to be made after closing, implicitly indicating that the deal would close.

6. See footnote 2.

7. The conversation between Stein and Boesel and the subsequent loan to Eagle illustrate a necessary element of promissory estoppel, that of detrimental reliance. Logically, the promise

must precede the promisee's alleged reliance. *See Moeller,* 434 N.W.2d at 889. In the case before us, BMI alleges a series of assurances, or promises, and a series of actions taken in reliance on those promises. To ultimately prevail on its promissory estoppel claim, BMI will have to establish that it took specific actions in reliance on specific promises.

We also observe that the facts of this case closely resemble those in the Second Circuit case, *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir.1989). In *Arcadian*, the parties had negotiated under the terms of a letter of intent which stated that a " 'binding sales agreement' " would be completed at a later date. *Id.* at 70. After both sides took numerous steps to consummate the deal, the seller changed its position on what percentage of ownership it wanted to retain, thereby triggering suit by the buyer. The Second Circuit reversed summary judgment for the defendant on the plaintiffs' promissory estoppel claim, stating that "Appellants' . . . claim is based on evidence that [the defendant] knew and approved of [the plaintiffs'] expenditures and collateral contracts, but . . . suddenly demanded a majority interest in [the plaintiff corporation] when the phosphate fertilizer business became 'dramatically' profitable." *Id.* at 74. The court concluded that triable issues existed as to whether the seller had made a clear and unambiguous promise to bargain in good faith, whether the buyer had reasonably and foreseeably relied on that promise, and whether the buyer had sustained an injury. *Id.* The court observed that prevailing on a promissory estoppel claim might not entitle the buyer to benefit-of-the-bargain damages. *Id.* at 73. Damages under promissory estoppel are often limited by the extent of the promisee's reliance rather than by the terms of the promise. *Id. See also* Restatement (Second) of Contracts, § 90 comment d; § 349 comment b (1979) (discussion of reliance damages).

The key facts here—the nonbinding letter of intent, the substantial steps taken toward consummating the deal, the aggrieved party's reliance on the assurances and actions of the other party—fit squarely within *Arcadian. See also Vigoda v. Denver Urban Renewal Authority*, 646 P.2d 900, 904–05 (Colo.1982) (summary judgment inappropriate where developer stated sufficient facts alleging promise of urban renewal authority to negotiate in good faith, detrimental reliance on that promise, and authority's subsequent refusal to negotiate); *Hoffman v. Red Owl Stores, Inc.*, 26 Wis.2d 683, 133 N.W.2d 267, 275 (1965) (if injustice can be avoided only by enforcement of promise that promisor should reasonably have expected to induce action or forbearance of a definite or substantial character by promisee, and the promise did induce such action or forbearance, then the promise is binding); *cf. Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 265 (2d Cir.) (no showing of clear and unambiguous promise made by seller or of reasonable reliance by buyer), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 78–79 (2d Cir.1984) (franchisee failed to provide evidence of clear, unambiguous promise or its reliance on promise).

Looking at the facts in the light most favorable to BMI, as we are required to do in determining a motion for summary judgment, we conclude that BMI has established a triable claim of promissory estoppel that would support an award of reliance damages. We therefore reverse the district court's grant of summary judgment on this issue.

### III.

BMI finally argues that it also established a triable claim of negligent misrepresentation based on Centronics' oral assurances that the deal would close. We reject this claim under the rule of *Meier v. Alfa–Laval, Inc.*, 454 N.W.2d 576, 580–82 (Iowa 1990), a case recently decided by the Iowa Supreme Court.

*Meier* states that the tort of negligent misrepresentation applies to "a person in the profession or business of supplying information or opinions" and that such a person "owes a duty of reasonable care to clients or others." *Id.* at 581. The tort does not properly apply to a "vendor of merchandise," *Meier* concludes, citing with approval a Columbia Law Review article that differentiates between those "engaged in the business or profession of supplying guidance to others" and parties dealing at "arm's length" in commercial transactions. *Id.* (citing Hill, *Damages for Innocent Mis-*

*representation*, 73 Colum.L.Rev. 679, 688 (1973)).[8]

The parties here were not in the business of supplying guidance to others; they were negotiating a commercial transaction at arm's length. The rule of *Meier* bars not only BMI's negligent misrepresentation claim, but also Centronics' counterclaim based on negligent misrepresentation. We therefore affirm the district court's grant of summary judgment on these claims.

For the reasons stated above, we affirm in part the district court's order and remand for further consideration of BMI's promissory estoppel claim.

---

8. Counsel for Centronics conceded at the oral argument in this appeal that its counterclaim for negligent misrepresentation is effectively disposed of under the rule of *Meier*.