**ROSS EXPLORATIONS, INC., and Tim R. Smith, Appellees,**

v.

**Earl R. WILSON; Estate of Clara M. Miller, Deceased; Dayton Hale, Jr., and Carol Miller Britt, Appellants.**

No. 90–2293.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1991.

Decided Oct. 9, 1991.

Rehearing and Rehearing En Banc Denied Nov. 13, 1991.

---

Isaac P. Espy, Tuscaloosa, Ala., for appellants.

Gregory Smith, Fort Smith, Ark., for appellees.

Before FAGG and LOKEN, Circuit Judges, and HAMILTON,* District Judge.

LOKEN, Circuit Judge.

In 1984, Earl R. Wilson and Clara Miller acquired executory rights to lease public land from the federal government for $1 an acre for oil and gas exploration and development. In 1985, they agreed to assign the leases, when issued, to plaintiffs Ross Explorations, Inc. and Tim R. Smith for $50 an acre plus a five percent overriding royalty. After the Mineral Leasing Act, 30 U.S.C. §§ 181 *et seq.*, was amended in 1987, plaintiffs acquired leases directly from the United States Bureau of Land Management (BLM) for $3.50 an acre and commenced this action to declare the assignment agreements unenforceable. The defendants— Wilson and his assignee, Dayton Hale, Jr., and the estate of Miller and her heir, Carol Miller Britt—appeal the judgment of the District Court [1] declaring that plaintiffs did not breach an implied covenant in the 1985 assignment agreements when they dealt directly with BLM. We affirm.

## I.

In August 1984, Wilson and Miller applied to BLM for oil and gas leases in Arkansas's Ouachita National Forest. At this time, under the Mineral Leasing Act, BLM allocated the right to lease most federal land, including the land in question, through a noncompetitive lottery conducted pursuant to 30 U.S.C. § 226(c) (1986). Under this program, all lottery applicants paid a $75 filing fee. A drawing was held to

---

* The HONORABLE JEAN C. HAMILTON, United States District Judge for the Eastern District of Missouri, sitting by designation.

1. The HONORABLE H. FRANKLIN WATERS, United States Chief District Judge for the Western District of Arkansas.

determine the successful, or "priority" applicants, who were then given the right to lease for ten years at the standard price of $1.00 per acre. The lottery program did not cover leases within a "known geological structure of a producing oil or gas field," or KGS, a BLM classification for land where the likelihood of striking oil or gas was very high. KGS land was leased competitively. *See generally* Patricia J. Beneke, *The Federal Onshore Oil and Gas Leasing Reform Act of 1987: A Legislative History and Analysis*, 4 J.Min.L. & Pol. 12 (1988).

The $1.00 price for noncompetitive leases was often a bargain, permitting priority applicants to resell their rights to lease in a secondary market. Thus, like many lottery applicants, neither Wilson nor Miller had any interest in drilling on the property they hoped to lease; instead, working through Miller's son-in-law, Kenneth Britt, a lease broker, they expected to resell any leases they were awarded for a quick and hefty profit.

In December 1984, BLM advised Wilson and Miller that they were the priority applicants on approximately 1200 acres. In January 1985, Wilson and Miller submitted written offers to lease the property, and Britt began looking for buyers. Britt contacted plaintiff Smith, another expert in oil and gas leasing, who was interested. In May 1985, the parties entered into the contracts at issue—identical two page letter agreements in which Wilson and Miller separately agreed that, "Upon issuance of the lease Sellers will assign the lease on an approved BLM form" to Smith and Ross Explorations (Smith's company) for $50 per acre plus a five percent "overriding royalty interest."

At this point, Wilson and Miller were seemingly assured a quick profit of $49 per acre as priority applicants, plus their right to the speculative five percent royalty. However, the deal was subject to an important contingency: even after the priority applicant's submission of a written offer to lease, BLM retained the right to reclassify the property as KGS, in which case it would put the lease out for competitive

bidding pursuant to 30 U.S.C. § 226(b)(1) (1986).

Although BLM's typical delay in accepting a priority applicant's offer to lease was about three months, in May 1985 the parties were aware that BLM was acting slowly on noncompetitive leases in Arkansas, both because of this Court's decision in *Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347 (8th Cir.1984), which criticized the agency's KGS determinations on other federal land in Arkansas, and because Arkansas Senator Bumpers was openly critical of the noncompetitive lottery program in general. As a result of these pressures, BLM had placed the issuance of all noncompetitive leases in Arkansas on "temporary suspension" while it investigated whether to reform its method of determining which properties should be competitively auctioned.

What appeared to be a temporary suspension when the assignment agreements were executed became an unforeseen BLM moratorium that dragged on for years. The parties complained to BLM about this delay, and BLM responded in March 1987 by offering Wilson and Miller the right to rescind their offers to lease. They declined, just as they declined Smith's suggestion in April 1987 that the executory assignment agreements be rescinded because BLM had not issued the leases for nearly two years.

The situation changed dramatically in December 1987 with the enactment of the Federal Onshore Oil and Gas Leasing Reform Act of 1987 ("the 1987 Act"). Pub.L. No. 100–203 (1987). The 1987 Act mandated that all federal land be made available initially by competitive bid, with a minimum bid fixed by statute at $2.00 per acre plus $1.50 per acre rental for the first five years. 30 U.S.C. §§ 226(b)(1), (d). The 1987 Act had a grandfather clause protecting most priority applicants, but pending offers for noncompetitive leases in the Ouachita National Forest were specifically made subject to prior competitive bidding. Pub.L. No. 100–203, § 5106(b). Thus, the 1987 Act required BLM to offer leases on a competitive bid basis before it could issue

the noncompetitive leases that Wilson and Miller had previously assigned to plaintiffs.

In January 1988, BLM announced its program for competitive bidding on the leases in question. Five year leases would be offered first for "nomination" and then for bid at an April 1988 sale. If anyone made a minimum bid of $3.50 per acre at the sale, BLM would issue a five year lease to the highest bidder. If no one bid, but at least two parties had nominated a lease, BLM would hold it over for a second competitive sale. If no one bid, and fewer than two had nominated, BLM would accept the priority applicant's prior offer to lease for ten years.

Between May 1985 and early 1988, world oil prices plunged, leaving the leases in question virtually worthless. Thus, Wilson and Miller [2] wished to obtain their ten year lottery leases and enforce the $50 per acre assignment to plaintiffs, while plaintiffs were equally desirous of avoiding that obligation.

Before the April 1988 sale, Smith and one of his employees nominated the Wilson and Miller leases. But neither they nor anyone else bid. With two nominations and no bid, BLM held the leases for sale at a future date. Thus, under the BLM's sale procedures, Smith's double nomination had prevented defendants from receiving their ten year leases at the conclusion of the April 1988 sale.

BLM scheduled the second sale for August 1989. Prior to the sale, Smith offered to resolve the situation by paying Wilson and Miller $10 per acre plus a 3% overriding royalty to cancel the assignment agreements, warning that plaintiffs would otherwise be forced to protect themselves. Defendants declined this offer, Wilson assigned his interest to defendant Hale for $2500, and Hale's attorney threatened to sue plaintiffs if they prevented defendants from receiving their ten year lottery leases. Nevertheless, Smith attended the auction, bid the minimum price of $3.50 per acre, and was awarded five year leases for the

properties. BLM then advised Wilson and Miller that their offers to lease had been rejected and that they had 30 days under BLM regulations to protest this decision. Defendants did not protest BLM's lease decisions.

Plaintiffs then commenced this suit in state court, seeking a declaratory judgment that the 1987 Act rendered the assignment contracts unenforceable. Defendants removed and filed a counterclaim alleging that plaintiffs had breached an implied covenant in the assignment contracts when they prevented defendants from obtaining leases from BLM.

After a three day court trial, the district court entered judgment in favor of plaintiffs declaring the assignment agreements "rescinded, voided, annulled, set aside and held for naught" and dismissing defendants' counterclaim. The district court held that the implied covenant asserted by defendants was contrary to public policy as reflected in the 1987 Act, that plaintiffs had therefore properly obtained their five year leases, and that plaintiffs' assignment obligations were never "triggered" because defendants never received their ten year leases.

On appeal, defendants argue that plaintiffs violated an implied covenant not to hinder or frustrate their performance of the contract, that this covenant does not violate public policy because the 1987 Act expressly permits priority applicants to obtain their leases (after an unsuccessful competitive sale), and therefore that plaintiffs are liable for breach of contract damages in the amount of $50 per acre plus the estimated value of the 5% royalty override. We affirm, though for a different reason than that expressed by the district court.

## II.

The assignment agreements that defendants seek to enforce were subject to a condition precedent—that BLM issue defendants the ten year priority applicant

---

**2.** By this time, Clara Miller had died. Her daughter, defendant Carol Miller Britt, is the undisputed heir to this interest.

leases. That condition precedent never occurred. Nevertheless, defendants argue that their failure to perform should be excused because it was plaintiffs' own conduct in obtaining five year BLM leases that frustrated defendants' ability to perform. Defendants posit that plaintiffs thereby breached an implied covenant not to frustrate performance of the contract, permitting defendants to enforce the contract as though they had obtained their BLM leases and were in a position to assign them. We disagree.

Defendants cite only the most general treatise authority, and no relevant cases, in support of their implied covenant theory. Although there appear to be no Arkansas cases on the subject, we believe that the Supreme Court of Arkansas would agree with the following general proposition:

Courts are reluctant to find implied covenants. They "must arise from the language used [in the contract] or be indispensable to effecting the intention of the parties."

*Budget Mktg., Inc. v. Centronics Corp.*, 927 F.2d 421, 426 (8th Cir.1991) (Iowa citations omitted). The implied covenant urged by defendants cannot satisfy this rigorous standard.

It is obvious that the parties to the 1985 assignment agreements never foresaw the situation that arose after the 1987 Act deprived defendants of their exclusive right as priority applicants to lease from BLM. Most revealingly, with respect to the one contingency both parties could foresee—that BLM would reclassify the property as KGS and open it to competitive bidding—Britt testified that his assumption was that plaintiffs as well as defendants would be entitled to bid. The nomination and sale procedure BLM devised to implement the 1987 Act was, in substance, a replacement for the KGS declaration process that the parties had known might interfere with their ability to complete the assignments. Thus, Britt's testimony strongly negates the presence of an implied covenant prohibiting plaintiffs from participating in that nomination and sale procedure.

Defendants' theory also ignores the dramatic change in the position of the parties from May 1985 to early 1988, when Smith nominated the properties and set in motion the events that led to plaintiffs obtaining their five year leases. By late 1987, the BLM moratorium on lottery leases had lasted two-and-a-half years. The world oil market was depressed, and the lease rights were virtually useless. The benefit to plaintiffs of their 1985 assignment bargain was long gone. Moreover, by early 1988, the law had changed, so that a basic operating assumption underlying the assignment agreements—that defendants had a "monopoly right" to the leases by reason of winning the lottery—was no longer true. None of this was foreseen by the parties when they entered into the assignment agreements, a fact demonstrated when BLM, recognizing the potential unfairness of its moratorium, offered defendants the right to rescind their otherwise irrevocable offers to lease.

It is arguable that these changed circumstances rendered the assignment agreements voidable under the doctrine of frustration, in which " 'performance remains possible but is excused whenever an event not due to the fault of either party supervenes to cause a ... destruction of the expected value of performance....' " *Pete Smith Company, Inc. v. City of El Dorado*, 258 Ark. 862, 529 S.W.2d 147, 148 (1976), quoting *Pacific Trading Co. v. Mouton Rice Milling Co.*, 184 F.2d 141, 148 (8th Cir.1950). At a minimum we conclude that, under the changed circumstances of 1988 and 1989, there was no implied covenant prohibiting plaintiffs from taking lawful action to avoid assignments that, by reason of unforeseen delays and changes in the law, would have given defendants an undue windfall.

For the foregoing reasons, the judgment of the district court is affirmed.