# IN THE SUPREME COURT OF IOWA

No. 19–0657

Filed March 27, 2020

**BLUE GRASS SAVINGS BANK,**

Appellee,

vs.

**COMMUNITY BANK & TRUST COMPANY,**

Appellant.

---

Appeal from the Iowa District Court for Muscatine County, John D. Telleen, Judge.

A subsequent lienholder appeals a foreclosure decree giving priority under a future-advances clause to the full amount of credit extended by the first lienholder rather than the maximum amount set forth in the notice provision of the first lienholder's mortgage. **DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

H. Raymond Terpstra II of Terpstra & Epping, Cedar Rapids, for appellant.

Richard A. Davidson of Lane & Waterman LLP, Davenport, for appellee.

**MANSFIELD, Justice.**

### I. Introduction.

This case requires us to interpret an Iowa statute relating to priority of advances under mortgages. *See* Iowa Code § 654.12A (2013). A bank made a series of loans to a farmer between April 2011 and March 2017. Near the middle of that time period, in 2014, the bank obtained a mortgage on a farm property with a future-advances clause. The bank's mortgage contained specific-dollar-amount language, as required by Iowa Code section 654.12A:

> **NOTICE: THIS MORTGAGE SECURES CREDIT IN THE AMOUNT OF $148,000.00. LOANS AND ADVANCES UP TO THIS AMOUNT, TOGETHER WITH INTEREST, ARE SENIOR TO INDEBTEDNESS TO OTHER CREDITORS UNDER SUBSEQUENTLY RECORDED OR FILED MORTGAGES AND LIENS.**

In May 2017, with his indebtedness to this bank exceeding $556,000, the farmer turned to another bank for financing. He took out a loan from the second bank for approximately $589,000, also secured in part by the same farm property. In 2018, the first bank filed a foreclosure proceeding. The fighting issue now is whether the first bank's lien on the farm priority has priority for *all* amounts due to the first bank or *only* up to $148,000, plus interest.

Based on the text of the statute, and other relevant considerations we discuss within this opinion, we conclude the first bank's priority is capped at $148,000, plus interest. We also hold the first bank is not allowed to collect default interest at 18% as part of its first-priority lien because there was no written agreement to pay such a rate. Accordingly, we reverse the foreclosure decree entered by the district court and remand for further proceedings.

## II. Facts and Procedural History.

The facts of this case are relatively straightforward and undisputed. Joseph L. Stecher is a farmer in Muscatine County. Between April 2011 and March 2017, he borrowed money from and issued promissory notes to Blue Grass Savings Bank. About halfway into the relationship, on May 23, 2014, Stecher entered into a purchase money mortgage with Blue Grass as mortgagee. The mortgage covered Lot 1 of Stecher Farms Subdivision in Muscatine County (Stecher Farms) and read in part as follows:

> **1. CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Mortgagor's performance under this Security Instrument, Mortgagor does hereby grant, bargain, warrant, convey and mortgage to Lender, the following described property:
>
> Lot 1, of Stecher Farms Subdivision in Muscatine County, Iowa.
>
> . . . .
>
> **NOTICE. THIS MORTGAGE SECURES CREDIT IN THE AMOUNT OF $148,000.00. LOANS AND ADVANCES UP TO THIS AMOUNT, TOGETHER WITH INTEREST, ARE SENIOR TO INDEBTEDNESS TO OTHER CREDITORS UNDER SUBSEQUENTLY RECORDED OR FILED MORTGAGES AND LIENS. HOWEVER, THE PRIORITY OF A PRIOR RECORDED MORTGAGE UNDER THIS SECTION DOES NOT APPLY TO LOANS OR ADVANCES MADE AFTER RECEIPT OF NOTICE OF FORECLOSURE OR ACTION TO ENFORCE A SUBSEQUENTLY RECORDED MORTGAGE OR OTHER SUBSEQUENTLY RECORDED OR FILED LIEN.**
>
> **2. MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time and from time to time will not exceed the amount stated above. Any limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

**3. SECURED DEBTS.** The term "Secured Debts" includes and this Security Instrument will secure each of the following:

    **A. Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, dated May 23, 2014, from Mortgagor to Lender, with a loan amount of $148,000.00 and maturing on May 23, 2017.

    **B. All Debts.** All present and future debts from Mortgagor to Lender, even if this Security Instrument is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt.

Notably, paragraphs 1 and 2 of the mortgage stated that the mortgage secured credit up to a principal amount of $148,000. The mortgage also stated that loans and advances up to that amount were "senior to indebtedness to other creditors under subsequently recorded or filed mortgages and liens." Paragraph 3, on the other hand, defined "secured debts" to include not only the $148,000 loan but "[a]ll present and future debts from Mortgagor to Lender." Paragraph 3, however, did not discuss priority vis-à-vis subsequent lienholders.

By March 2017, Stecher's outstanding borrowings from Blue Grass on the various promissory notes totaled approximately $556,965.32, not including interest. Yet on the 2014 note that had been used specifically to buy Stecher Farms, the principal balance was approximately $139,341.51, down from the original $148,000.

At that point, Stecher sought financing from another source—Community Bank & Trust Company. On March 18, 2017, Community Bank loaned Stecher $589,502.59, taking a mortgage on the same farm property (i.e., Stecher Farms). A Community Bank loan officer reviewed Blue Grass's existing mortgage at the time of the transaction. He concluded that Blue Grass's mortgage only gave Blue Grass lien priority up to $148,000, plus interest.

About a year-and-a-half passed. On August 10, 2018, following unsuccessful farm mediation, Blue Grass filed a petition in the Iowa District Court for Muscatine County to foreclose on Stecher Farms. Blue Grass alleged that its mortgage secured its entire $556,965.32 debt, plus interest.

Stecher did not contest foreclosure. However, Community Bank, which was named as a defendant because of its junior mortgage, filed an answer alleging that Blue Grass's mortgage was "capped at a loan amount of $148,000.00." Blue Grass moved for summary judgment of foreclosure; Community Bank resisted the motion.

The district court held a hearing, and on April 8, 2019, the court granted Blue Grass's summary judgment motion. Relying largely on an unpublished decision of our court of appeals, the district court found that Blue Grass's priority over Community Bank was not limited to the $148,000 amount set forth in the mortgage. Rather, Blue Grass's priority extended to all debt secured by the Blue Grass mortgage to the extent the funds had been advanced to Stecher before the recording of the Community Bank mortgage. The district court also ruled that Blue Grass was entitled to charge an 18% rate of interest after default.

That same day, the district court entered a decree of foreclosure. The decree was consistent with the court's summary judgment ruling, although it did not include interest at the default rate because the court decided the interest rate was a moot point. Since the principal amount of the debt being foreclosed on by Blue Grass far exceeded the value of the property, it did not matter what interest rate was allowed.[1]

Community Bank appealed, and we retained the appeal.

---

[1]At the summary judgment hearing, Blue Grass estimated the value of Stecher Farms to be $200,000.

### III. Standard of Review.

"We review rulings on motions for summary judgment for correction of errors at law." *Young v. Iowa City Cmty. Sch. Dist.*, 934 N.W.2d 595, 601 (Iowa 2019).

### IV. Analysis.

**A. Is the Priority of Blue Grass's Mortgage Lien Capped at $148,000 in Principal?** Iowa Code section 654.12A, entitled "Priority of advances under mortgages," was enacted in 1984 and amended in 1990. *See* 1990 Iowa Acts ch. 1001, § 1; 1984 Iowa Acts ch. 1272, § 2. It provides in relevant part,

> Subject to section 572.18, if a prior recorded mortgage contains the notice prescribed in this section and identifies the maximum credit available to the borrower, then loans and advances made under the mortgage, up to the maximum amount of credit together with interest thereon, are senior to indebtedness to other creditors under subsequently recorded mortgages and other subsequently recorded or filed liens even though the holder of the prior recorded mortgage has actual notice of indebtedness under a subsequently recorded mortgage or other subsequently recorded or filed lien. So long as credit is available to the borrower, payment of the outstanding mortgage balance to zero shall not extinguish the prior recorded mortgage if it contains the notice prescribed by this section. The notice prescribed by this section for the prior recorded mortgage is as follows:

> NOTICE: This mortgage secures credit in the amount of ....... Loans and advances up to this amount, together with interest, are senior to indebtedness to other creditors under subsequently recorded or filed mortgages and liens.

Iowa Code § 654.12A (2013). The May 23, 2014 mortgage between Stecher and Blue Grass had such a notice, identifying $148,000 as the relevant amount of credit. Yet it also purported to secure not just the $148,000 loan that had just been extended, but "[a]ll present and future debts from Mortgagor to Lender." This is sometimes referred to as a "dragnet clause."

*See Freese Leasing, Inc. v. Union Tr. & Sav. Bank*, 253 N.W.2d 921, 923 (Iowa 1977).

The question then becomes, "What is the legal significance of the notice prescribed by Iowa Code section 654.12A?" Community Bank contends that the amount in the notice—$148,000 plus interest—is the maximum priority that Blue Grass's mortgage can obtain over a subsequently recorded mortgage on the same property. Blue Grass, on the other hand, contends that the notice does not limit its priority where the advances occurred before the second mortgage was recorded. In other words, according to Blue Grass, the dollar credit limit in the section 654.12A notice only applies to advances that occur *after* the later mortgage is recorded.

In any question of statutory interpretation, we begin with the words of the statute. *See State v. Gross*, 935 N.W.2d 695, 703 (Iowa 2019). "If the language is unambiguous, our inquiry stops there." *Id.* (quoting *State v. Richardson*, 890 N.W.2d 609, 616 (Iowa 2017)).

On its face, Iowa Code section 654.12A states that "loans and advances made under the mortgage, up to the maximum amount of credit together with interest thereon, are senior to indebtedness to other creditors under subsequently recorded mortgages." Iowa Code § 654.12A. It draws no distinction between advances made *before* the subsequent mortgage is recorded and those made *afterward*. Thus, at first blush, the language of section 654.12A supports Community Bank's position that $148,000, the amount in the notice here, is an overall cap. *See id.* The language seems plain.

Reading further, the first sentence of section 654.12A also includes the following clause: "even though the holder of the prior recorded mortgage has actual notice of indebtedness under a subsequently

recorded mortgage or other subsequently recorded or filed lien." *Id.* This indicates on its face that the statute protects principal advances up to the maximum amount *even in* that particular situation, but the statute does not suggest principal advances *above* that amount are ever protected. Significantly, the "NOTICE" that immediately follows and that is also part of the statute omits that clause—suggesting it is not essential to understanding the meaning of section 654.12A. *See Iowa Ins. Inst. v. Core Grp. of the Iowa Ass'n for Justice,* 867 N.W.2d 58, 72 (Iowa 2015) ("[W]e read statutes as a whole . . . .").

Moreover, the section uses the term "subsequent[]," not the term "intervening" that is seen in other contexts. There is a potential difference between the two. "Intervening lien" might imply that one is talking about liens that *intervene* between two events—presumably (1) the recording of the first lien and (2) the disbursement of the future advances that are claimed to have priority over the second, intervening lien. Thus, to say that future advances up to a maximum amount have priority over an "intervening" lien might imply that the advances in question occurred after the second lien was recorded. "Subsequent[]" has no such connotation.

But Blue Grass argues we should interpret Iowa Code section 654.12A against the backdrop of the common law. Some of the nation's leading textualists see a role for interpreting texts in that way. *See, e.g., Apple Inc. v. Pepper,* 587 U.S. ___, ___, 139 S. Ct. 1514, 1526 (2019) (Gorsuch, J., dissenting); *Ziglar v. Abbasi,* 582 U.S. ___, ___, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring in part and concurring in the judgment). So have we. *See Rowedder ex rel. Cookies Food Prods., Inc. v. Lakes Warehouse Dist., Inc.,* 430 N.W.2d 447, 452 (Iowa 1988). Iowa Code chapter 4 directs that we may consider the common law when a statute is ambiguous. *See* Iowa Code § 4.6(4).

Under the common law in Iowa, a first mortgage is presumed to have priority over any junior mortgage. *See Van Dusseldorp v. State Bank of Bussey*, 395 N.W.2d 868, 870 (Iowa 1986) ("The bank's mortgage was executed and recorded prior to that of plaintiff. Consequently, any indebtedness which it secures would be prior to the lien of plaintiff's mortgage." (Footnote omitted.)). Mortgages with dragnet clauses are also enforceable (even if disfavored). *See Freese Leasing, Inc.*, 253 N.W.2d at 925; *see also Decorah State Bank v. Zidlicky*, 426 N.W.2d 388, 390 (Iowa 1988) ("Future advances clauses are valid but courts look upon them with a definite lack of enthusiasm."). However, under the common law rule, "actual notice of a subsequent encumbrance would defeat the priority of advancements under a prior recorded mortgage." *First State Bank v. Kalkwarf*, 495 N.W.2d 708, 713 (Iowa 1993). Thus, once the first mortgagee had actual knowledge of a subsequent encumbrance, any further advances under the first mortgage would occupy a third position behind the subsequent encumbrance.[2]

Blue Grass contends that section 654.12A was intended to give senior lienholders more rights than they had under the common law by protecting even advances they made with actual knowledge of the junior lien up to the amount in the notice, without affecting their prior common law rights as to advances made before the junior lien was in place. In the view of Blue Grass, the entire purpose of section 654.12A was to fortify the first lienholder's rights.

Blue Grass directs us to *National Bank of Waterloo v. Moeller*, 434 N.W.2d 887 (Iowa 1989). The case was decided just a few years after

---

[2]There is some question whether advances that were "obligatory"—i.e., that the lender was obligated to make—would nonetheless have priority. *See Nat'l Bank of Waterloo v. Moeller*, 434 N.W.2d 887, 888 (Iowa 1989); *Corn Belt Tr. & Sav. Bank of Belle Plaine v. May*, 197 Iowa 54, 64–65, 196 N.W. 735, 740 (1924).

section 654.12A was enacted, although the statute did not apply because the underlying transactions predated it. *Id.* at 890–91. National Bank of Waterloo and the Mason City Production Credit Association (PCA) both had liens on Moeller's property and were engaged in a priority dispute. *Id.* at 888. The PCA's prior mortgages secured approximately $275,000 in indebtedness, and they included future-advances clauses. *Id.* The bank had obtained its mortgage later, in March 1983. *Id.* By December 1983, though, Moeller's balance due to the PCA was down to $70,000. *Id.* at 890. However, further advances by the PCA that "clearly related to" the original transactions pushed that figure up to $300,000 by 1985. *Id.* at 890, 892. That is when the bank foreclosed. *Id.* at 890. Applying an analysis that focused on "the equities of the present case," we found that the PCA's liens had priority over the bank's lien. *Id.* at 891–92. We noted that the bank was "very much aware of PCA's prior mortgages" yet took no action for eighteen months to assure that its mortgage had priority. *Id.* at 891.

Regarding Iowa Code section 654.12A, we commented in *Moeller* as follows:

> The new law, passed in 1984, clearly favors senior mortgagees. It provides, in pertinent part, that mortgage instruments containing prescribed language giving notice of a future advances provision,
>
>> are senior to indebtedness to other creditors under subsequently recorded mortgages . . . or filed liens even though the holder of the prior recorded mortgage has actual notice of indebtedness under a subsequently recorded mortgage or other subsequently recorded or filed lien.

*Id.* at 891 (quoting Iowa Code § 654.12A (1987)). Again, we didn't apply section 654.12A in the *Moeller* case. *See id.* That means the foregoing

statements were dicta. Nonetheless, seizing on the "clearly favors senior mortgagees" language, Blue Grass argues that the 1984 law was intended to improve the position of senior lienholders, not make it harder for them to enforce future-advances clauses as to amounts advanced ahead of junior liens.

We are not sure the dicta in *Moeller* were correct or at least complete. Perhaps Iowa Code section 654.12A was intended to *clarify* the common law and make it more administratively workable. In other words, sometimes the new provision would benefit the senior lienholder by priming the senior lienholder's advances up to the dollar limit in the notice regardless of the timing of those advances. Sometimes the new provision would benefit the junior lienholder by capping the priority of the senior lienholder's advances to the dollar limit in the notice regardless of timing. Either way, it would eliminate uncertainty for the parties and reduce the need to resort to "the equities" as we did in *Moeller*. Both parties would be able to rely on the amount set forth in the recorded notice within the first lienholder's mortgage. Notably, in *Moeller*, we cited no authority for our suggestion that section 654.12A was only a win for senior lienholders.

The legislative history lends some support to the view that section 654.12A aimed for administrative clarity. *See* Iowa Code § 4.6(3) (2013) (stating that if a statute is ambiguous, the court may consider "[t]he legislative history"). The section was enacted as part of a new law governing "home equity mortgages." *See* 1984 Iowa Acts ch. 1272. The legislation was entitled, "An Act providing for the creation of a home equity line of credit and priority of advances under mortgages securing the home equity line of credit." *Id.* The legislation was divided into two parts. *Id.* Section 1 of the legislation authorized home equity loans, whereas section 2 became Iowa Code section 654.12A. *Id.*

We can surmise that the general assembly believed the notice-and-cap provision in section 654.12A would help support the home equity loan industry in Iowa. Home equity loans in the 1980s often involved frequent, small-scale extensions of credit. Richard P. Eckman & Andrew T. Semmelman, *A Look at Home Equity Loans: Some Problems and Solutions*, 41 Bus. Law. 1079, 1079 (1986) [hereinafter Eckman & Semmelman] ("Customers typically access home equity loans by credit card or by writing a check against the account."). The outstanding balance could fluctuate constantly. *Id.* Therefore, subsequent lenders needed a quick and easy way to estimate the available equity in the home. Meanwhile, prior home equity lenders needed to know they had a lending cushion up to a fixed amount or credit limit. The section 654.12A notice in the mortgage would have accomplished both things.[3] If our theory about the origins of section 654.12A is correct, it logically suggests that the notice and dollar cap would apply regardless of timing. Of course, the statute is not limited to home equity loans, but its genesis as part of home-equity-lending legislation suggests its underlying purpose may have been administrative convenience rather than favoring one category of lienholders over another.

The Restatement (Third) of Property: Mortgages is also instructive. *See* Restatement (Third) of Prop.: Mortg. (Am. Law Inst. 1997). This Restatement, adopted in 1997, was the first restatement of the law of real property security. *See id.* at 3. One of its major goals was "to assist in

---

[3]Eckman and Semmelman note the following about state statutes modifying the common law governing lien priority for future advances:

> Most states' statutes governing lien priority for future advances afford any future advance the lien priority of the originally recorded mortgage. However, certain statutes condition this priority protection on the lenders having provided certain disclosures in the original mortgage document.

Eckman & Semmelman, 41 Bus. Law. at 1084–85 (footnote omitted). They place Iowa Code section 654.12A in the second category of statutes.

unifying the law of real property security by identifying and articulating legal rules that will meet the legitimate needs of the lending industry while at the same time providing reasonable protection for borrowers." *Id.* In a comment entitled "*Agreements to secure future advances, as against third parties,*" the Restatement explains the significance of a maximum principal amount,

> If the mortgage merely mentions that future advances will be secured, a subsequent grantee or lienor cannot tell from a reading of the mortgage what the secured amount may be, but will be on notice that an inquiry must be made of the mortgagee to discover that amount. Even if the mortgage states the maximum principal amount, such an inquiry is highly prudent, since the mortgage's statement will not inform the subsequent grantee or lienor of the accrued interest, advances to protect security, or other similar items to which he or she will be subordinate. Nevertheless, the statement of maximum principal provides at least a rough gauge of the maximum total balance.

*Id.* § 2.1 cmt. *c,* at 48. Thus, when the mortgage discloses a maximum principal amount, the Restatement indicates the subsequent lienor should be able to rely on it as "a rough gauge of the maximum total balance." *Id.* An illustration in the same section goes on:

> 7. A borrows $100,000 from B and executes a mortgage on A's land. The mortgage recites: "This mortgage is given to secure payment of $100,000, and shall secure future advances, but the total principal shall not exceed $100,000." Subsequently the parties enter into a separate agreement that B will advance an additional $50,000 to A, and that this advance will be secured by the mortgage. Thereafter A sells the land to C, who has no notice of the separate agreement. Only $100,000 of the total principal debt is secured by the mortgage as against C; the remaining $50,000 is unsecured.

*Id.* § 2.1 cmt. *c,* illust. 7, at 49–50. This illustration in some ways resembles the present case. Community Bank had notice of the $148,000 cap on future advances and no notice that this cap had been lifted. Under

such circumstances, the Restatement seemingly would limit Blue Grass's priority to the $148,000, plus interest.

A recent law review article also appears to confirm our interpretation of Iowa Code section 654.12A. *See* R. Wilson Freyermuth & Dale A. Whitman, *Residential Mortgage Default and the Constraints of Junior Liens*, 57 U. Louisville L. Rev. 207, 218–19 (2019). The article discusses various types of state legislation, including the following:

> The second model for state legislation on future advances simply declares that all advances up to some maximum amount stated in the mortgage will have full priority against intervening liens. At least seventeen states have such statutes, although some are limited to specific types of loans. The approach is simpler, of course, but it disregards the borrower's ability to obtain junior financing. In this legal environment, *the only practical stance a second mortgage lender can take is* to assume that advances up to the stated maximum might be made by the first lender, and *to consider only the property's value in excess of that maximum as being available to secure a second mortgage loan.*

*Id.* (emphasis added) (footnote omitted). Although Iowa is not specifically identified as a state with a "second model" law, *see id.* n.59, section 654.12A clearly does fall within the description. Notably, the authors suggest a subsequent lender can consider the property's value "in excess of that maximum as being available to secure a second mortgage loan," without drawing any distinction based on the timing of the first lender's advances.

In addition, as Community Bank points out, its favored interpretation of Iowa Code section 654.12A dovetails with the law in several other states. In *New Mexico Bank & Trust Co. v. Lucas Bros.*, a first lienholder held a $20,000 mortgage that also contained a dragnet clause. 582 P.2d 379, 380 (N.M. 1978). At the time the second lienholder obtained its mortgage, the first lender had a balance due of $5000 on the mortgage

but $55,200 in total debt from the borrower. Quoting from New Mexico's recently enacted counterpart to section 654.12A, the New Mexico Supreme Court commented, "Although not controlling in the present case, we are persuaded by the rationale and the logic of the statute." *Id.* at 381. The New Mexico court went on, "Because potential lenders rely upon the recorded mortgages to determine whether to make other loans there must be certainty as to the extent to which a mortgage encumbers property." *Id.* Accordingly, the court found the first lienholder "has first priority in the real estate in the amount of $20,000 plus costs, interest and attorney's fees." *Id.* at 382. Other jurisdictions have reached similar conclusions. *See Mark Twain Kansas City Bank v. Cates*, 810 P.2d 1154, 1162–63 (Kan. 1991) (finding that under a similar Kansas statute, where the first lienholder with a $200,000 mortgage and a dragnet clause was owed $600,000 when the second lienholder obtained its position, the first lienholder's priority could be no more than $200,000); *S. Side Nat'l Bank v. Commerce Bank of St. Louis, N.A.*, 897 S.W.2d 657, 659 (Mo. Ct. App. 1995) ("These two provisions [of the Missouri Code] make it clear that all advances made pursuant to a deed with a future advance clause relate back to the date of the deed for creditor priority purposes, so long as the balance owing on any given day does not exceed the face amount of the mortgage."). Significantly, Community Bank highlighted caselaw from these three jurisdictions in its briefing, and Blue Grass did not respond.

Two other points should be noted. First, even reading the mortgage alone without reference to Iowa Code section 654.12A, it appears to grant Blue Grass priority over a subsequent lienholder only up to the principal amount of $148,000 plus interest. True, there is language in the mortgage that would grant Blue Grass a security interest in Stecher Farms to cover "[a]ll present and future debts." But on the subject of *priority*, the

mortgage speaks with one voice. It states that "LOANS AND ADVANCES UP TO [$148,000], TOGETHER WITH INTEREST, ARE SENIOR TO INDEBTEDNESS TO OTHER CREDITORS UNDER SUBSEQUENTLY RECORDED OR FILED MORTGAGES AND LIENS." No one disputes that Blue Grass can claim a security interest in Stecher Farms for the full amount of Stecher's indebtedness to it. The pertinent question is the relative priority between Blue Grass's security interest above $148,000, plus interest and Community Bank's security interest.

Second, as was pointed out by Community Bank at oral argument, the principal amount in the Iowa Code section 654.12A notice does not necessarily tie the lender's hands. As a condition of its ongoing extensions of credit, Blue Grass could have asked `Stecher to execute an amendment to the Stecher Farms mortgage increasing the limit above $148,000. Blue Grass did not do so.

For all these reasons, we conclude that $148,000 is the principal amount as to which Blue Grass's mortgage has priority over Community Bank's mortgage. We now turn to the issue of default interest.

**B. Can Blue Grass Collect 18% Default Interest?** The Blue Grass promissory notes provide as to interest:

> **3. INTEREST.** Interest will accrue on the unpaid Principal balance of this Notes at the rate of [typically 5.500 or 6.000] percent (Interest Rate).
>
> **A. Interest After Default.** If you declare a default under the terms of the Loan, including for failure to pay in full at maturity, you may increase the Interest Rate otherwise payable as described in this section. In such event, interest will accrue on the unpaid Principal balance of this Note at the Interest Rate in effect from time to time under the terms of the Loan, until paid in full.
>
> **B. Maximum Interest Amount.** Any amount assessed or collected as interest under the terms of this Note will be limited to the maximum lawful amount of interest allowed by state or federal law, whichever is greater. Amounts collected

in excess of the maximum lawful amount will be applied first to the unpaid Principal balance. Any remainder will be refunded to me.

**C. Statutory Authority.** The amount assessed or collected on this Note is authorized by the Iowa usury laws under Iowa Code §§ 537.2601 and 535.2 et.seq.

On the morning of the summary judgment hearing, March 20, 2019, Blue Grass filed an affidavit of its loan officer recalculating interest amounts due and stating that Blue Grass "elected to increase the interest rate of the loans from the date of default and/or maturity to 18% per annum." (The affidavit was misdated March 19, 2017, but was presumably executed March 19, 2019.) Until then, Blue Grass had been claiming interest at the nondefault rates shown in the promissory notes, which generally ranged from 5.5% to 6.0%. Community Bank objected to this procedure at the ensuing hearing.

Iowa Code section 535.2 allows agricultural lenders and borrowers to "agree in writing to pay any rate of interest." Iowa Code § 535.2(2)(*a*)(5). The promissory notes did not specify an actual default rate of interest, although they indicated that Blue Grass may increase the interest rate upon default. We need not decide whether such an open-ended "Interest After Default" provision constitutes a valid written agreement under section 535.2 that *could* allow a default rate of 18% to be charged. Regardless, Blue Grass's attempted retroactive increase just two-and-half hours before the summary judgment hearing does not comply with either the parties' agreements or section 535.2. We hold that Blue Grass is limited to the interest rates it had continuously charged and alleged up until the day of the summary judgment/foreclosure hearing.

## V. Conclusion.

For the foregoing reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

**DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Waterman, J., who takes no part.